UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CYNTHIA E. L.,<br><br>Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL, Acting Commissioner of Social Security,[1]<br><br>Defendant. | Case No. 5:18-cv-01638-KES<br><br>MEMORANDUM OPINION AND ORDER |

## I.

## BACKGROUND

Plaintiff Cynthia E. L. ("Plaintiff") applied for Social Security disability benefits on June 2, 2014, alleging disability commencing July 9, 2013, her last day of work as a department manager at Wal-Mart. Administrative Record ("AR") 178, 208, 394. On June 5, 2017, an Administrative Law Judge ("ALJ") conducted a hearing at which Plaintiff, who was represented by an attorney, appeared and testified, as did a vocational expert ("VE"). AR 32-74. On September 20, 2017,

---

[1] Effective November 17, 2017, Ms. Berryhill's title is "Deputy Commissioner for Operations, performing the duties and functions not reserved to the Commissioner of Social Security."

1

the ALJ issued an unfavorable decision.  AR 10-27.  The ALJ found that Plaintiff suffered from the medically determinable severe impairments of "degenerative disc disease of the lumbar spine with lumbar musculoligamentous strain; Achilles tendinitis of the right ankle; and right sinus tarsi syndrome with neuritis."  AR 16.  The ALJ found that Plaintiff's obesity, diabetes mellitus, hypertension, history of abdominal disorders, adjustment disorder, depressed mood, and anxiety symptoms were non-severe impairments.  AR 16-19.  Despite these impairments, the ALJ found that Plaintiff had a residual functional capacity ("RFC") to perform light work with some additional restrictions.  AR 19.  Of relevance here, the ALJ found that Plaintiff could stand and/or walk for 6 hours out of an 8-hour workday with normal breaks and required "a sit/stand option at-will without going off-task."  Id.

Based on the RFC analysis and the VE's testimony, the ALJ found that Plaintiff could work as an office helper (Dictionary of Occupational Titles ["DOT"] 239.567-010), mail clerk (DOT 209.687-026), and counter clerk (DOT 249.366-010).  AR 25-26.  The ALJ concluded that Plaintiff was not disabled.  AR 26.

## II.
## ISSUES PRESENTED

Issue One: Whether the ALJ's RFC finding that Plaintiff can stand or walk for 6 hours in an 8-hour workday lacks substantial evidentiary support.

Issue Two: Whether the ALJ erred in evaluating Plaintiff's subjective symptom testimony.  (Dkt. 24, Joint Stipulation ["JS"] at 4.)

## III.
## DISCUSSION

A. **ISSUE ONE: Evidentiary Support for the ALJ's RFC Determination.**

    **1. Summary of Relevant Medical Evidence.**

Plaintiff injured her right ankle playing hopscotch on July 9, 2013, and she never worked at Wal-Mart again.  AR 43-44, 325 ("Was playing hop skotch 2

months ago when she had pain with normal hopping. No twisting injury to the ankle."), 394. On August 29, 2013, she reported ankle pain to her treating doctors at the Riverside Medical Center ("RMC") who diagnosed her with Achilles tendinitis and a "foot contusion"; they prescribed her a controlled ankle movement ("CAM") boot and Motrin. AR 325-26. They recommended rest, ice, and a follow-up appointment in six weeks. AR 326.

On October 10, 2013, Plaintiff presented with a "normal gait" and her treatment plan was to "wean" her off the boot, do physical therapy, wear comfortable shoes, and follow-up in two months. AR 324-35.

On October 24, 2013, Plaintiff started physical therapy to treat her right ankle pain/tendinitis with PT George Marchis. AR 321. Plaintiff reported that she was still wearing the CAM boot and walking was "difficult." AR 321-22. PT Marchis set as a goal "patient will be able to ambulate 15-20 minutes at a time in order for her to be able to do her job in 8 weeks." AR 321. Plaintiff was scheduled for 10 sessions, 1 per week. Id. PT Marchis assessed her rehabilitation potential as "fair/good." Id.

On November 5, 2013, Plaintiff told PT Marchis that she had "minimal complaints of pain in the Achilles [tendon]" and reported her pain level as only 2/10. AR 320. On November 13, 2013, she reported, "Some soreness in the ankle" and a pain level of 4/10. AR 318. She told PT Marchis, "After prolong[ed] walking [she] feels like she is getting a blister at the bottom of the foot," but upon his checking, "there is no blister." Id. She had "minimal to no limp when ambulating." Id.

On November 26, 2013, Plaintiff reported experiencing an "ankle pop" two days earlier that had caused pain at a 5/10 level ever since. AR 313. She had a "minimal antalgic limp" and could "ambulate more than 250 feet with no walking boot at a slow speed." AR 314.

On December 3, 2013, she reported pain of 6/10 that was temporarily

improved by using K-tape. AR 311. PT Marchis reported, "overall, she is responding well to physical therapy." AR 312. Plaintiff, however, did not return to complete her physical therapy; the December 3rd session was her last with PT Marchis. AR 292. In March 2014, PT Marchis discharged her for "fail[ing] to follow up with therapy." Id.

On December 6, 2013, Plaintiff saw Dr. Patrick Serynek at RMC who noted no calf atrophy but an antalgic gait. AR 309-10. He recommended restarting the CAM boot and getting an MRI. AR 310. The MRI was initially interpreted to show "some inflammation in the foot and ankle as well as a cyst …." AR 309. At a January 6, 2014 appointment, however, Dr. Serynek explained that the "cyst was not anywhere near her painful areas," and he recommended pain management, physical therapy, and a follow-up in 8 weeks. AR 308.

On January 8, 2014, Plaintiff attended an initial pain management appointment with a psychologist. AR 306. Plaintiff also interacted with a new physical therapist, PT Pamela Hauger, this time concerning pain in her "low back into buttocks and LEs [lower extremities]." AR 304-05. She told PT Hauger that she was not currently in physical therapy, even though she still had an active referral at this time to return to PT Marchis. AR 305. She told PT Hauger that she had been suffering "constant" pain at a level of 5/10 for the past six months that had decreased her activity level by 50%. Id. PT Hauger observed that Plaintiff walked into the medical office with no assistive device and did not have an antalgic gait. Id. She prescribed Plaintiff a TENS unit. Id. On January 16, 2014, however, Plaintiff reported that she "wished to decline further services from pain management"; she was discharged from the program. AR 301.

On January 29, 2014, Plaintiff met with another RMC physician, Dr. Melissa Buffington, for "ankle/foot pain" but reported "no other concerns." AR 298-99. Dr. Buffington discussed potential side effects of nortriptyline, a nerve pain medication and antidepressant, and Plaintiff indicated that she wanted treatment, so

4

Dr. Buffington prescribed nortriptyline.  AR 301.

On February 10, 2014, Plaintiff reported that the nortriptyline was not helping, and she was having leg spasms and severe pain in both legs.  AR 297.  Later in February, she contacted RMC about extending her "off work order"; she had been scheduled to return to work on February 18, 2014, but RMC agreed to extend the order until the date of her next appointment.  AR 296-97.

On February 18, 2014, Plaintiff saw Dr. Serynek to "follow up on foot pain."  AR 295.  He noted that now she was reporting pain over the "dorsolateral aspect" of her ankle (i.e., the top of her foot/ankle) rather than her Achilles tendon.  Id.  He saw no calf atrophy or swelling, but Plaintiff displayed an antalgic gait.  AR 296.  He revised the assessment to "neuritis."  Id.

On February 27, 2014, Plaintiff returned to Dr. Buffington to treat her back pain.  AR 293-04.  She reported "ongoing right ankle pain for almost 1 year."  AR 294.  Dr. Buffington referred her for physical therapy, but Plaintiff declined.  AR 294.  Dr. Buffington prescribed more pain medication.  Id.

In March 2014, Plaintiff saw podiatrist Dr. Pham for a second opinion.  AR 291.  He observed that the range of motion for her foot and ankle was "intact" and there was no pain upon palpation of her Achilles, but her right sinus tarsi was tender.  Id.  He diagnosed her with right sinus tarsi syndrome and neuroma.  AR 292.  He recommended a "short leg cast" with crutches for 3-4 weeks.  Id.

Plaintiff returned to Dr. Serynek on April 15, 2014, describing her right foot and ankle as "still hurts, still swollen."  AR 289.  He removed her cast and observed "swelling not present."  AR 290.  He recommended restarting TENS therapy and pain management.  Id.

On May 1, 2014, Plaintiff saw RMC's Dr. Takhar about her back pain.  AR 284.  She told him that she was experiencing "difficulty moving her right foot and chronic pain" ever since her hopscotch injury, and she had tried pain management but "couldn't complete due to financial issues."  Id.  She was limping on the right

side and declined to try heel or toe walking due to pain. AR 286. He recommended physical therapy, but Plaintiff again declined because "it causes more pain." AR 287. He referred her for acupuncture and ordered an MRI. Id.

The May 2014 MRI showed a "small slipped disc" at L5-S1. AR 284; see also AR 460 (interpreting MRI as showing "mild narrowing" at L5-S1[2]). Dr. Takhar recommended that she make a follow-up appointment if her pain persisted after acupuncture. Id. Plaintiff tried acupuncture, but she reported that it "made her right foot/ankle pain worse." AR 282.

On May 19, 2014, Plaintiff asked RMC to extend her off-work order. AR 283. Plaintiff reported that she was "unable to put weight on her foot." AR 281. Dr. Serynek responded, "Give her one more month but let her know that this will be the last note that I provide." AR 283.

In June 2014, Plaintiff attended orientation for a pain management program but she did not enroll, telling her doctors that "she is not ready to proceed at this time" for financial reasons. AR 448.

On July 22, 2014, consultative examiner Dr. Bernabe performed an orthopaedic evaluation. AR 394-98. Dr. Bernabe observed that Plaintiff was "able to move about the office without assistance." AR 396. He conducted seated and supine straight leg raising tests with negative results. Id. Joints in her hips, knees, ankles, and feet exhibited a normal range of motion. AR 396-97. Plaintiff had 5/5 muscle strength in both legs. AR 397. He observed that she could "walk without difficulty" including on her toes and heels. Id. He diagnosed her as suffering from

---

[2] Plaintiff's counsel describes this MRI as showing "moderate to severe degenerative changes" but provides no supporting cite. (JS at 7.) Counsel may have intended to refer to an MRI from May 2017 which did report "moderate to severe disc narrowing" and other findings, but also stated, "The above findings are so common in adults without lower back pain that while we report their presence, they must be interpreted with caution …." AR 1436.

Achilles tendonitis of the right ankle and lumber musculoligamentous strain, but he opined that she could still walk or stand 6 hours in an 8-hour day. Id.

In August 2014, state agency consultant Dr. Chan opined that Plaintiff could stand or walk "about 6 hours" in an 8-hour workday with normal breaks. AR 80. Dr. Chan noted that while Plaintiff alleged she had difficulty standing or walking for "average amounts of time," the consultative examiner observed her to have a "normal gait" and "no difficulties moving about the office." AR 79. On reconsideration, Dr. Bayar offered the same opinion. AR 91-92.

On August 14, 2014, Plaintiff returned to the pain management program. AR 438. Plaintiff reported that she could not drive or work, but she enjoyed reading, jigsaw puzzles, and crocheting. AR 439. She was unable to exercise formally but tried to take walks in her backyard garden. AR 434. An August 15, 2014 physical examination found her motor strength "right 3/5 due to reduced effort from pain and left 5/5" with a negative straight leg raising test. AR 437. She declined to try heel or toe walking due to pain. Id.

Later in August 2014, Plaintiff returned to physical therapy with PT Stacye Basye. AR 429. The goals included standing for 20 minutes and walking for 40 minutes. AR 430. She reported that standing more than 10 minutes or walking more than 30 minutes aggravated her pain. Id. She was, however, able to swim for exercise 4-5 days/week for 60 minutes. AR 431.

When Plaintiff saw RMC's Dr. Barker for pain management in September 2014, she was walking with a cane. AR 421. Dr. Barker noted that she was tolerating Gabapentin well and was selling Avon products.[3] AR 419.

In October 2014, she told Kaiser[4] that she could perform all her own

---

[3] Compare AR 44 (hearing testimony that Plaintiff has had no job "at all" since leaving Wal-Mart).

[4] It appears that RMC was (or became) part of the Kaiser network, because

7

activities of daily living and gardened. AR 461. In January 2015, she increased her Gabapentin dosage. AR 590. This made her "sedated and dizzy," so it was reduced in February 2015. AR 613. She told Kaiser that she never had any back pain or leg pain until she "was in a boot the second time after hopscotch injury to her ankle at the end of 2013." Id. On February 13, 2015, Kaiser noted that she had a "normal" gait and did not use any assistive device to ambulate. AR 627. She received lumbar epidural steroid injections for pain management which brought "35-40% improvement." AR 629; compare AR 659 (last steroid injection in February 2015 brought "minimal relief"), AR 722 (epidural injections helped for 1 month).

At an appointment on February 18, 2015, Plaintiff reported that she had experienced right ankle pain for two years and that her ankle was "progressively getting more painful and swollen." AR 640. Dr. Bowes at Kaiser observed that her ankle was swollen, but her gait was "normal." AR 641. Plaintiff was referred for an MRI of her right foot and ankle. Id. The MRI was an "unremarkable" study. AR 643-44. Two days later on February 20, 2015, however, PT Theodora Winn observed an antalgic gait. AR 653.

At a physical examination in March 2015, Dr. Sojda at Kaiser noted no calf atrophy but an antalgic gait. AR 673. In April 2015, however, her gait was normal. AR 682, 686.

In May 2015, she went the emergency room ("ER") complaining of back pain. AR 711. She was taking Percocet every 8 hours and was instructed to increase it to every 6 hours. AR 711, 713. She reported radiating leg pain and intermittent leg numbness. AR 721. She told Dr. Takhar that she was not interested in more physical therapy. AR 722. Her gait was antalgic. AR 724.

In May 2015, she underwent another spinal MRI. AR 727. It revealed "no

---

Plaintiff saw some of the same treating sources at RMC and Kaiser.

change at the lumbar spine" as compared to the May 2014 MRI. Id. A straight leg raising test in June 2015 was negative. AR 736. In September and October 2015, she had normal leg strength, muscle tone and gait. AR 773, 785.

In November 2015, Plaintiff went to another Kaiser pain management appointment. AR 793. She described her back pain as being an average of 6/10 and having a "gradual onset" after "wearing a medical boot and being on crutches" due to right ankle pain. Id. She reported limitations on walking, bathing, dressing, and toileting. Id. Gait testing revealed "mildly antalgic gait but normal coordination." AR 795. Dr. Dhamija noted, "patient's pain appears refractory to conservative modalities with good symptom response with prior interventions." AR 797-98. Dr. Dhamija recommended a lumbar epidural steroid injection followed by "focused physical therapy" as "the most important treatment modality." AR 798.

While hospitalized in 2016 for abdominal pain[5], she was able to ambulate to the bathroom. AR 1357, 1363. As late as 2017, Plaintiff was spending ½-hour/day exercising (AR 1126) and had negative straight leg raising tests (AR 1175).

In July 2017, Plaintiff underwent another consultative examination with Dr. Schoene. AR 1451. He observed a normal gait, normal range of ankle motion, and no ankle swelling, inflammation, or tenderness. AR 1454. He opined that she could walk or stand 6 hours in an 8-hour workday. AR 1455.

**2. The ALJ's Determination of Plaintiff's RFC.**

The ALJ gave "little weight" to the state agency consultants and Dr. Bernabe's opinions. AR 23. The ALJ assessed more functional restrictions than

---

[5] Plaintiff requested a cholecystectomy (AR 1353, 1408, 1411), but her treating doctor did not feel she needed surgical intervention for pain relief, because she had "unremarkable" labs (AR 1366, 1415). She claimed to a nurse in July 2016 that she was "told" that she needed to have her gall bladder removed. AR 1357. She eventually had an elective cholecystectomy. AR 1421.

they did, but agreed with their opinions that Plaintiff could stand or walk 6 hours in an 8-hour workday. The ALJ reasoned that MRIs and other diagnostic tests had revealed "moderate" findings, Plaintiff had received "moderate" treatment that improved her condition, and Plaintiff suffered from a combination of impairments. AR 24. Regarding ambulation, the ALJ cited multiple records throughout the period of claimed disability when Plaintiff was observed by medical sources to have a normal gait, intact range of motion, or negative straight leg raising test. AR 22-23, citing AR 296, 318, 329, 396, 442, 1175, 1316, 1326, 1454.. The ALJ disbelieved Plaintiff's testimony that she has extreme difficulty ambulating. AR 22.

### 3. Analysis of Claimed Errors.

      a. Substantial Evidence Supports the ALJ's RFC.

The decision of the Commissioner may be reversed only if it is not supported by substantial evidence or if it is based on legal error. Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971). If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner. Tackett, 180 F.3d at 1097; Morgan v. Commissioner, 169 F.3d 595, 599 (9th Cir. 1999). The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005). Thus, to prevail, Plaintiff must demonstrate that the medical evidence cannot rationally be interpreted as supporting a finding that Plaintiff can stand or walk for 6 hours in an 8-hour workday. Stated differently, the ALJ's RFC may be reversed only if it is not supported by substantial evidence. Tackett, 180 F.3d at 1097.

10

As summarized above, Plaintiff stopped working because of a 2013 hopscotch injury to her right ankle – not the kind of injury one would expect to cause permanent disability. Just a few months after her injury, she had a normal gait and reported low pain levels. AR 324-35, 320. A 2013 MRI of her right foot and ankle showed only a cyst that did not concern her doctor (AR 308) and a 2015 MRI was totally unremarkable (AR 643-44). While she initially reported pain in her right Achilles tendon, by February 2014 she was reporting pain in a different location. AR 295. In May 2014, Dr. Serynek thought that she was capable of returning to work in one month. AR 283. Indeed, in November 2014, she was capable of "prolonged walking" and thought that she had developed a blister. AR 318. Throughout the period of claimed disability, Plaintiff alternated between a normal gait and antalgic gait with no corresponding, observable change in her physical condition, a fact that the ALJ could rationally interpret as evidence that Plaintiff was exaggerating her difficulty ambulating.

Plaintiff points to November 2013 physical therapy records with PT Marchis, arguing that if her therapy goal was to ambulate "for 15-20 at a time," then she must not have been able to do so. (JS at 6, citing AR 321.) The ALJ, however, could rationally have interpreted these records as indicating that Plaintiff was physically capable of ambulating longer but unwilling to do so in the therapy setting, given (1) her "normal gait pattern" pre-therapy (AR 324), (2) the lack of any objective evidence of a serious ankle or foot injury in 2013, (3) her unrealistic reports of rapid worsening (i.e., on November 5, 2013, she had "minimal" pain, but by November 26 she was limping and could walk only 250 feet [AR 320, 313]), (4) PT Marchis's assessment at their last session that Plaintiff was "responding well to physical therapy," (AR 312), (5) Plaintiff's failure to complete physical therapy with PT Marchis (AR 292).

Plaintiff also points to physical therapy records from late 2014 which stated as goals standing for 20 minutes and walking for 40 minutes. (JS at 7, citing AR

11

430.) By February 2015, that goal (and all the other therapy goals) were still marked as "not met." AR 652. Again, the ALJ could rationally have interpreted this evidence as failing to reflect Plaintiff's actual abilities. Even the goal of "Patient will be able to use TENS unit" was marked "not met" in February 2015. Id. Plaintiff, however, had received a TENS unit and instructions for using it in January 2014. AR 305-06. The pain management nurse stated, "Patient appears to understand how to operate the TENS unit safely and correctly." AR 306. Plaintiff later testified that she is able to use a TENS unit. AR 55. Thus, an equally reasonable interpretation of all the "not met" notations is that the physical therapist never updated that section of her computerized records.

All four medical sources who opined on Plaintiff's ability to walk/stand found that Plaintiff could walk/stand for 6 hours in an 8-hour workday. AR 80, 91-92, 397, 1455. In contrast, no medical sources opined that Plaintiff could not stand or walk for 6 hours.

Much of Plaintiff's briefing summarizes her own reports to medical sources about her limitations. The record, however, shows several occasions when Plaintiff declined to exert her full effort or engage in part of an examination. See, e.g., AR 286-97, 437. For example, Plaintiff would sometimes refuse to try toe or heel walking, but when she tried for Drs. Bernabe and Schoene, they observed that she could do so without difficulty. AR 397, 1453. As discussed below, the ALJ gave legally sufficient reasons for discounting Plaintiff's testimony concerning the degree to which her conditions impaired her ability to ambulate.

For all of these reasons, Plaintiff has failed to demonstrate that the ALJ's RFC lacks substantial evidentiary support.

### b. The RFC Is Not Internally Inconsistent.

Plaintiff argues that the RFC is "internally inconsistent," because "it is impossible for someone to be able to stand and/or walk 6 hours out of an 8 hour work day while simultaneously having an 'at will' sit/stand option." (JS at 8.)

Plaintiff apparently interprets an at-will sit/stand option to mean that the worker must be permitted to sit as much as he/she desires, even if more than two hours, making it inherently inconsistent with light work.

The Ninth Circuit has affirmed an agency decision setting a claimant's RFC as light work with an at-will sit/stand option. Zamora v. Comm'r of Soc. Sec. Admin., 471 F. App'x 579, 579 (9th Cir. 2012) ("The ALJ's determination that Zamora was capable of light work with a sit/stand option at will was therefore consistent with Dr. Teran's medical assessment.").

Moreover, to the extent that a light work RFC is arguably incompatible with an at-will sit/stand limitation, the ALJ took the appropriate step of putting the issue to the VE. The VE testified that the DOT does not address which jobs have an at-will sit/stand option, but that based on his experience, the jobs of office helper, mail clerk, and counter clerk offered that option. AR 68; see also Buckner-Larkin v. Astrue, 450 F. App'x 626, 627 (9th Cir. 2011) (finding no error in sedentary RFC with at-will sit/stand option where VE found that the recommended jobs would allow for an at-will sit-stand option).

Plaintiff's attorney questioned the expert on various topics at the hearing. Plaintiff neither challenged the VE's testimony that a person with Plaintiff's RFC could perform the three identified jobs nor inquired how the VE reconciled an at-will sit/stand option with light work. AR 71. The factual issue is waived on appeal. See Shaibi v. Berryhill, 870 F.3d 874, 881-82 (9th Cir. 2017) ("[A]n agency, its experts, and its administrative law judges are better positioned to weigh conflicting evidence than a reviewing court"; represented party "waives such a challenge on appeal" if not presented to agency); Dollarhide v. Berryhill, No. ED CV 16-2279 MRW, 2017 U.S. Dist. LEXIS 199098, at *9 (C.D. Cal. Dec. 4, 2017) ("Plaintiff's attorney questioned the expert on various topics at the hearing. However, Plaintiff did not challenge the expert's testimony that a person with Plaintiff's RFC could perform the identified jobs. The factual issue is waived on

13

appeal.").

### c. An At-Will Sit/Stand Option Does Not Necessarily Take Workers Off-Task.

Finally, Plaintiff argues that exercising an at-will sit/stand option would "undoubtedly result in … being off task for a significant portion of the work day if the changes of position between sitting and standing were occurring on a frequent basis, perhaps every 5 to 15 minutes." (JS at 9.)

The ALJ expressly asked the VE about "a sit/stand option at will, without going off task," and the VE testified that such a restriction was consistent with the three identified jobs. AR 67-68. The ALJ was entitled to rely on the VE's opinion as substantial evidence. See Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005) ("A VE's recognized expertise provides the necessary foundation for his or her testimony."). It is easy to imagine how an office helper, mail clerk, or counter clerk could alternate between sitting and standing without going off-task. A counter clerk could have a chair or stool behind the counter that he/she sometimes uses. An office helper or mail clerk might have an adjustable workstation or alternate between tasks that require walking (like delivering mail) and tasks that can be done sitting.

## B. ISSUE TWO: Plaintiff's Subjective Symptom Testimony.

### 1. Rules for Evaluating Subjective Symptom Testimony.

It is the ALJ's role to evaluate the claimant's testimony regarding subjective pain or symptoms. See Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012). "[T]he ALJ is not required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." Id. at 1112 (internal quotation marks omitted). An ALJ's assessment of symptom severity is entitled to "great weight." Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989).

If an individual alleges impairment-related symptoms, the ALJ must

evaluate those symptoms using a two-step process.  First, "the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'"  Treichler v. Comm'r of SSA, 775 F.3d 1090, 1102 (9th Cir. 2014) (quoting Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007)).  If so, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the <u>degree</u> of symptom alleged."  Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996).

Second, if the claimant meets the first test, the ALJ may discredit the claimant's subjective symptom testimony only upon making specific findings that support the conclusion.  Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010).  If the ALJ finds testimony as to the severity of a claimant's pain and impairments is unreliable, then the ALJ must make findings "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony."  Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002); Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir. 2015).  Absent a finding or affirmative evidence of malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony.  Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995); Ghanim v. Colvin, 763 F.3d 1154, 1163 & n.9 (9th Cir. 2014).

If the ALJ's findings are supported by substantial evidence in the record, courts may not engage in second-guessing.  Thomas, 278 F.3d at 959.

**2. The ALJ's Reasons for Discrediting Plaintiff's Testimony.**

The ALJ gave at least four reasons for discrediting Plaintiff's testimony concerning the intensity, persistence, and limiting effects of her pain: (1) her testimony lacked objective support; (2) Plaintiff made statements about her limitations that were "inconsistent" with her medical records; (3) Plaintiff failed to follow prescribed treatment; and (4) Plaintiff engaged in activities inconsistent with her claimed degree of limitation.  AR 20-24.

d. <u>Reason One</u>: Lack of Objective Evidence.

"Although lack of medical evidence cannot form the sole basis for discounting pain testimony," ALJs may consider that factor in their analysis. <u>Burch</u>, 400 F.3d at 681. The ALJ correctly pointed out that the MRIs, x-rays, and electrodiagnostic studies Plaintiff underwent did not show the kind of significant abnormalities that one would expect in a person who is totally disabled. AR 23, citing AR 326, 381, 451, 524, 1320, 1436, 1440, 1443.

e. <u>Reason Two</u>: Plaintiff's Inconsistent Statements.

The ALJ contrasted several aspects of Plaintiff's hearing testimony with the medical evidence. First, Plaintiff testified that her right foot was in "constant" pain with swelling, and the "swelling has never really gone all away." AR 21, citing AR 51. The ALJ cited medical records in which Plaintiff did not report significant right foot/ankle pain, was observed to have no right ankle swelling, and/or had a normal range of right ankle motion. AR 23, citing AR 286, 296, 318, 329, 1440, 1454.

The ALJ next pointed out that Plaintiff claimed walking was painful and she struggled to walk even short distances. AR 21. In June 2014 Plaintiff reported that if she walked as far as 500 feet, then her right foot "throbs" and her ankle "swells" and she had to sit with her foot elevated for a least an hour to relieve the pain. AR 221. At the hearing, she testified that her left foot "will go numb" and cause "shooting pain" when she stands to walk. AR 48-49. She described it as pain that shoots through her leg and "all the way up [her] back." AR 49. She testified, "The left is worse than the right at this point," apparently referring to pain from her back into her legs. AR 50. The ALJ contrasted Plaintiff's testimony about extreme walking difficulty with all the medical records documenting that she had a "normal" gait, a physical therapy progress note stating that "prolonged walking" had aggravated her foot pain, and Dr. Bernabe's observations that she could walk around his medical office without difficulty. AR 21-22, citing AR 397, 785, 823,

1442, 1453.. Indeed, the hearing occurred on June 5, 2017. AR 32. On June 15, 2017, Kaiser observed that Plaintiff had a "normal gait." AR 1442.

At the hearing, Plaintiff testified that she could not drive because driving made her back spasm and she took Percocet three times per day. AR 39. In July 2016, however, Plaintiff told Kaiser that she "stopped driving after car accident a few years ago." AR 1411.

The ALJ also concluded that Plaintiff claimed she had needed a cane to walk when she did not. AR 22. In a June 2014 questionnaire, Plaintiff checked boxes to indicate that she used a cane and wheelchair. AR 223. She explained that she used a cane "for walking any distance" and an "electric wheelchair" for shopping. Id. She went shopping by herself every week but used a "cane or electric scooter." AR 222. At the hearing she clarified that she did not have a wheelchair, but she used a scooter to shop because she could not walk through a store. AR 52-53.

Despite the wheelchair response being clarified, Plaintiff also testified that she "walked with a cane for a while." AR 44. She stopped using a cane because "they say that the cane was hindering my ability to keep my spine semi-level." AR 52. She testified that her right foot had not gotten any better, at which point the ALJ interjected that it must have improved somewhat since she was no longer wearing a CAM boot or using crutches. AR 46. She explained that she only needed crutches if she was wearing the boot, and she could not use the boot because it hurt her back. AR 46. She testified that her pain management classes had taught her exercises to do "when the pain gets too severe … so that [she] can walk without the aid of crutches." AR 47.

The Court was unable to find (and the parties did not cite) any medical records in which a medical source advised Plaintiff to start or stop using a cane. There is one reference to cane use in September 2014. AR 421. Per Plaintiff's medical records, in July 2014 she was "able to walk without difficulties." AR 397. She attended physical therapy with PT Basye on September 16, 2014. AR 422-23.

17

She presented with an antalgic gait, but she did therapeutic exercise, and PT Basye did not note that she was using a cane. AR 423. The next day, Plaintiff saw Dr. Barker who observed that she was walking with a cane but also reported being able to walk in her backyard, do all her own activities of daily living, and sell Avon products. AR 419-21. On September 18, 2014, Plaintiff again saw PT Basye who did not note use of a cane. AR 416-18. Just a few days later on September 30, 2014, Plaintiff saw Dr. Bowes for a muscle spasm in her back. AR 406. Dr. Bowes noted, "Gait normal. Coordination normal." AR 407.

The ALJ could rationally interpret this evidence as revealing inconsistencies between what Plaintiff told the Social Security Administration and what Plaintiff told her doctors. These inconsistencies provide a clear and convincing reason to discount Plaintiff's subjective symptom testimony.

    f. <u>Reason Three</u>: Failure to Follow Prescribed Treatment.

The ALJ largely discussed Plaintiff's failure to follow treatment recommended for her complaints of abdominal pain. AR 22. As noted in the summary of medical evidence above, Plaintiff stopped or declined physical therapy on multiple occasions, despite it being consistently recommended by her doctors. AR 298, 294, 308, 324-35, 798. While Plaintiff alleged that she stopped pain treatment for financial reasons, the record does not suggest the same for physical therapy. A claimant's failure to follow prescribed treatment suggests that his/her condition as not as serious as alleged. See Bubion v. Barnhart, 224 Fed. App'x 601, 604 (9th Cir. 2007) (ALJ properly discounted plaintiff's credibility based on failure to follow prescribed treatment of physical therapy and plaintiff did not provide an acceptable reason for not following prescribed course of treatment).

    g. <u>Reason Four</u>: Inconsistency with Activities.

Plaintiff testified that on a "good" day, she spends "at least" 70% of the time lying down with her right leg elevated on a pillow. AR 51. On a bad day, she does not get out of bed except to use the bathroom. AR 52. The ALJ contrasted this

testimony with her reports that she "shopped, cleaned, performed yard-work, cleaned the floor, cleaned the bathroom, cleaned the kitchen, and tended to plants." AR 20, citing AR 221-23. There is also evidence that Plaintiff traveled out of state in July 2015 (AR 752), babysat her 4-year-old granddaughter in December 2016 (AR 1104), and traveled to Las Vegas with her husband in January 2017 (AR 1118).

Plaintiff argues that these inconsistencies are not a valid reason for discrediting her testimony, because none of her reported activities are equivalent to persisting at light work for 8 hours. (JS at 14.) The key question, however, is whether Plaintiff's reported activities are inconsistent with her claimed limitations. See Lingenfelter, 504 F.3d at 1040 (noting that factor in reviewing testimony is "whether the claimant engages in daily activities inconsistent with the alleged symptoms"). The ALJ could rationally conclude that Plaintiff's relatively normal reported activities are inconsistent with spending "at least" 70% of her "good" days lying down.

## IV.
## CONCLUSION

For the reasons stated above, IT IS ORDERED that judgment shall be entered AFFIRMING the decision of the Commissioner.

DATED: June 25, 2019

_____
KAREN E. SCOTT
United States Magistrate Judge

19